# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN PANARELLO and SHERI PANARELLO, | : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | : <br> : |
| CITY OF VINELAND, et al., | : <br> : |
| Defendants. | : <br> : |

Civil. No. 12-4165 (RBK/JS)

**OPINION**

**KUGLER**, United State District Judge:

This civil rights suit arises from a series of disputes between Plaintiff John Panarello ("Panarello") and his wife, Plaintiff Sheri Panarello[1] (collectively, "Plaintiffs") and their neighbors, Defendant Detective Antonio "Pete" Ramos ("Ramos") and his wife, Defendant Jeanne Ramos (collectively, the "Ramos Defendants") that eventually escalated to the point where Panarello was arrested on July 7, 2010.  Plaintiffs allege that the situation surrounding Panarello's arrest and subsequent prosecution was a violation of Panarello's constitutional rights. Plaintiffs have brought claims against the Ramos Defendants as well as the City of Vineland (the "City"), Chief of Police Timothy Codispotti (the "Chief" or "Codispotti"), and Sergeant Jeffrey Riggione ("Riggione") (collectively, the "Municipal Defendants") and four individual police

---

[1] There appears to be some disagreement as to how Mrs. Panarello spells her name.  The Court will use the spelling in the caption.

offiers—Adam Shaw, Matthew Laielli, Brian Armstrong, and James Day (collectively, the "Officer Defendants").[2]

Presently before the Court are the Municipal Defendants' Motion for Summary Judgment ("Municipal Defendants' Motion" or "Muni. Defs.' Mot.") [Dkt. No. 163], the Officer Defendants' Motion for Summary Judgment ("Officer Defendants' Motion" or "Off. Defs.' Mot.") [Dkt. No. 164]; and Plaintiffs' Cross Motion for Summary Judgment ("Plaintiffs' Cross Motion" or "Pls.' Cross Mot.") [Dkt. No. 166].  For the reasons that follow, the Municipal Defendants' Motion is **GRANTED-IN-PART AND DENIED-IN-PART**, the Officer Defendants' Motion is **GRANTED-IN-PART AND DENIED-IN-PART**, and the Plaintiffs' Motion is **DENIED**.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY[3]

### A.     Panarello's Arrest on July 7, 2010

The basic background facts of the events leading up to Panarello's arrest on July 7, 2010 are undisputed, as are the events until any police officer crossed the property line onto Plaintiffs' property.  These facts are recited concisely by the Officer Defendants and have been adopted by the Plaintiffs.  (*See* Pls.' Responsive SMF [Dkt. No. 166-1] at 2 ("Specifically, Plaintiffs agree with the following initial paragraphs and statements . . . .").)

> Plaintiffs John and Sheri Panarello, husband and wife, resided at 57 Yelkca Avenue in Vineland, New Jersey.  They lived in an unremarkable, quiet residential area.  Their neighbors at 59 Yelkca were Antonio "Pete" Ramos and his wife,

---

[2] Plaintiffs also named Officer Timothy Delouise, John Doe(s) (A–Z), and Cumberland County in their Complaint.  Cumberland County was subsequently dropped from the case in the First Amended Complaint [Dkt. No. 79].

[3] All citations to any statement of material facts are only to those facts which the opposing party has admitted, unless otherwise indicated.

Jeanne Ramos.  Pete Ramos was (and is) a police officer with the Vineland Police Department.

Beginning in the fall of 2009, the Ramos Family and Panarello Family became engaged in a series of petty and borderline ridiculous disputes.  They bickered over pets, the installation of a privacy fence, noise, and each accused the other of engaging in obnoxious activity.  It seems that Pete and John both had knack for getting under the skin of the other.

On July 7, 2010, there was a confrontation between John Panarello and his neighbor Antonio "Pete" Ramos.  Panarello was using a weed whacker to trim vegetation growing along the Panarello and Ramos property line.  Pete Ramos was outside cleaning his swimming pool.  Ramos accused Panarello of knocking weeds and debris into his pool.  For whatever reason, Ramos shot a stream of water over the fence towards John Panarello.  Panarello and Ramos—separated by the fences—then exchanged words and cursed at each other.

Rather than simply walking away, Panarello instead grabbed a wooden board that was on the ground nearby.  He raised the board and smacked it on the top the privacy fence.  From his side of the fence, Ramos grabbed one end of the board.  On the other side of the fence, Panarello gripped the other end of the board.  The two men then struggled for control over the board.

Panarello was able to pull the board back onto his side of the fence.  He stepped back, and waited.  He thought that Ramos might try to come over the fence.  Ramos never did come over the fence. . . .

Jeanne Ramos saw the confrontation between her husband and John Panarello. She called the police and reported to a Sergeant that John Panarello attempted to strike her husband with a board.  Officer Matthew Laielli was ordered to Yelkca Avenue.  Officer Laielli was told that an assault had just occurred.

Once at the scene, Officer Laielli went and spoke with Pete and Jeanne Ramos.  Antonio "Pete" Ramos reported to Officer Laielli that the neighbor, John Panarello, tried "hitting them with a board."  Likewise, Jeanne Ramos reported to Officer Laielli that the neighbor, John Panarello, tried "hitting them with a board."

After hearing their side of the story, Officer Laielli then left Pete and Jeanne Ramos to go get John Panarello's version of events.  Laielli was accompanied by Officer Adam Shaw.  Elsewhere in the vicinity was Officer Brian Armstrong, who was trying to locate John Panarello.  None of the young officers knew John or Sheri Panarello.

(Pls.' Responsive SMF at 2–3 (quoting Off. Defs.' Mot. Br. [Dkt. No. 164-1] at 1–2).)

Officers Laielli and Shaw then proceeded to the Plaintiffs property to try and locate Panarello, and walked up Plaintiffs' driveway.  (Off. Defs.' SMF [Dkt. No. 164-3] ¶ 56.)  While on the driveway, Officer Laielli spotted Panarello in his backyard, and called out to him, "Yo, I

need to talk to you."  (Off. Defs.' SMF ¶¶ 59–60; Pls.' Cross Mot. SMF [Dkt. No. 166-1] ¶¶ 27–

28.)  At this point, Panarello turned and moved away from the officers.  (Off. Defs.' SMF ¶ 61;

Pls.' Responsive SMF ¶ 61.)  Officers Laielli and Shaw both believed that Panarello may be

retreating into his home to obtain a weapon, and also believed that Panarello was at that moment

committing the crime of obstruction, and so went into the backyard to detain and arrest

Panarello.  (Off. Defs.' SMF ¶¶ 63–64, 68, 76–80, 99, 104–05.)  Officer Laielli grabbed

Planarello around the waist right around the threshold to the back door of the house, and the two

tumbled into the house.  (Off. Defs.' SMF ¶ 86; Pls.' Responsive SMF ¶ 86.)  Officer Shaw

followed Officer Laielli and assisted in placing Panarello under arrest.  (Off. Defs.' SMF ¶¶ 90,

108.)

The parties disagree entirely as to what happened within the house beyond the fact that

Panarello was arrested and was struck by Officers Laielli and Shaw.  The Officer Defendants

submit that Panarello was fighting with Officers Laielli and Shaw, and that they both struck him

because of his acts of resisting arrest.  (Off. Defs.' SMF ¶¶ 109–14.)  Plaintiffs counter that the

Officer Defendants purposely struck him while he was restrained in order to beat him.  (Pls.'

Responsive SMF at 12–13.)  Plaintiffs also submit that the Vineland Police Department

("VPD"), under the direction of Sergeant Riggione, failed to adequately preserve video evidence

of the incident.  (*See* Pls.' Cross Mot. SMF ¶¶ 59–69).  The Municipal Defendants and Officer

Defendants dispute this.

Panarello was then taken to a patrol car so that Officer Armstrong could transport him to

the police station.  (Off. Defs.' SMF ¶ 118; Pls.' Responsive SMF at 14.)  Officer Armstrong

called for EMS to meet him at the police station to tend to Panarello's injuries.  (Off. Defs.' SMF

¶ 119.)  Plaintiffs then argue that Officer Armstrong, having placed Panarello unrestrained in the

backseat, stopped and accelerated abruptly to cause Panarello additional injuries.  (Pls.'
Responsive SMF at 14).  Officer Armstrong disputes this version of events.

Upon arrival at the police station, Officer Day met Panarello and Officer Armstrong.
(Off. Defs.' SMF ¶¶ 121–22.)  The parties agree that while in the police station, Officer Day
used oleoresin capcisum ("OC") spray, also known as pepper spray, on Panarello.  (Off. Defs.'
SMF ¶ 127; Pls.' Responsive SMF at 15.)  The parties dispute everything else pertaining to the
circumstances leading up to the use of the OC spray and the subsequent remedial actions the
police officers may or may not have taken.  At a certain point, an EMS worker tried to assist
Panarello, and Panarello spit blood on her.  (Off. Defs.' SMF ¶ 133.)[4]

### B.    Criminal Proceedings

Multiple criminal charges were filed against Panarello as a result of the July 7, 2010
incident—two counts of assault on a police officer, one count of assault on an EMS worker, one
count of aggravated assault, one count of resisting arrest, one count of obstruction, and two
weapons possession counts.  (Off. Defs.' SMF ¶¶ 134–40.)  Panarello subsequently filed two
criminal complaints against Officers Laielli and Shaw for assaulting him.  (Off. Defs.' SMF
¶ 141.)[5]  The charges were all downgraded to disorderly persons offenses and remanded to
Municipal Court.  (Off. Defs.' SMF ¶ 142.)

---

[4] Plaintiffs deny this paragraph, but as will be explained in Section I.B., *infra*, Panarello was
convicted of assault on the EMS worker for spitting blood on her.  The Court cannot accept
Plaintiffs' denial of this paragraph in light of the conviction.

[5] Plaintiffs deny this paragraph, but in light of the criminal proceedings that specifically
adjudicated these two counts of assault, the Court cannot accept this denial.  *See* Trial Decision
Tr. at 36:11–25, *State v. Panarello* (Glassboro Muni. Ct. Sept. 26, 2013) (Muni. Defs.' Ex. K;
Off. Defs.' Ex. R)

A trial was held on the charges against all three defendants—Panarello, Officer Laielli, and Officer Shaw—and the Honorable William J. Golden, J.M.C., entered judgment convicting Panarello of resisting arrest in violation of N.J.S.A. 2C:29-2a and assault on the EMT who came to treat him in violation of N.J.S.A. 2C:12-1b(5)(c).  *See* Trial Decision Tr., *State v. Panarello* (Glassboro Muni. Ct. Sept. 26, 2013) (Muni. Defs.' Ex. K; Off. Defs.' Ex. R).  Panarello appealed his conviction for resisting arrest to the New Jersey Superior Court, Law Division.  (Off. Defs.' SMF ¶ 179.)  The Honorable Kevin T. Smith, J.S.C., entered judgment affirming the conviction.  *See* Order Aff'g Conviction, *State v. Panarello*, Muni. Appeal No. A-28-13 (N.J. Super. Ct. Law Div. June 24, 2014) (Muni. Defs.' Ex. L; Off. Defs.' Ex. S).

### C.    Civil Proceedings

Plaintiffs filed a tort claims notice on or about September 30, 2010.  (Off. Defs.' SMF ¶ 183.)  Plaintiffs subsequently filed this action on July 9, 2012, [Dkt. No. 1], and then filed their First Amended Complaint (the "FAC") [Dkt. No. 79] on November 17, 2014.  Plaintiffs allege violations of the Constitution under 42 U.S.C. §§ 1983, 1985, and 1986, as well as state law torts and violations of the New Jersey constitution.  The Municipal Defendants and Officer Defendants now move for summary judgment on all claims asserted in the FAC, seeking dismissal of the FAC in its entirety, and Plaintiffs cross move for summary judgment on the warrantless entry and arrest claims and the spoliation of evidence claims.

## II.    JURISDICTION

Plaintiffs bring claims under 42 U.S.C. §§ 1983, 1985, and 1986 as well as under the state constitution and state common law.[6]  Accordingly, this Court exercises subject matter

---

[6] Plaintiffs' claims under the New Jersey constitution will be construed to be claims under the New Jersey Civil Rights Act (the "NJCRA"), N.J.S.A. 10:6-2.  *See George v. Bd. of Educ. of*

jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and supplemental jurisdiction over the accompanying state law claims pursuant to 28 U.S.C. § 1367.

## III.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The moving party bears the burden of establishing that no genuine issue of material fact remains.  *See Celotex*, 477 U.S. at 322–23.  A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  *See Anderson*, 477 U.S. at 252.  Even if the facts are undisputed, a disagreement over what inferences may be drawn from the facts precludes a grant of summary judgment.  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The nonmoving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial."  *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). Further, the nonmoving party must come forth with affidavits and evidence in support of their position; merely relying on the pleadings and the assertions therein is insufficient to demonstrate

---

*Twp. of Millburn*, 34 F. Supp. 3d 442, 458 (D.N.J. 2014) (finding that the NJCRA provides a cause of action to address violations of the New Jersey constitution, and that a claim under the New Jersey constitution would be redundant to a claim under the NJCRA) (citations omitted).

7

a genuine issue of material of fact on a motion for summary judgment.  *Celotex*, 477 U.S. at 324;

*see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (citing Fed. R. Civ. P. 56(e)

and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).  The court's role in

deciding the merits of a summary judgment motion is to determine whether there is a genuine

issue for trial, not to determine the credibility of the evidence or the truth of the matter.

*Anderson*, 477 U.S. at 249.


IV.     **DISCUSSION**

   A.     **Tort Claims Notice**

   As an initial matter, all defendants at some point argue that Plaintiffs have failed to

comply with the provisions of the New Jersey Tort Claims Act, N.J.S.A. 59:1-1, et seq.

("NJTCA"), and that the state law tort claims grounded in any events that took place subsequent

to Panarello's arrest must be dismissed.  (*See* Muni. Defs.' Mot. Br. at 49–50 (abuse of process),

59–60 (malicious prosecution), & 67–68 (both); Off. Defs.' Mot. Br. at 17–21 (common law tort

claims related to Officer Armstrong's transport of Panarello, Officer Day's use of OC spray, and

spoliation/concealment of evidence by Officer Shaw and Officer Laielli.)  For the reasons that

follow, the Municipal Defendants' Motion and Officer Defendants' Motion will be granted in

this respect.

   New Jersey state law requires that prior to filing a complaint against a public entity or

public employee, the plaintiff must submit a notice of claim to the public entity within ninety

days of the claim accruing.  *See* N.J.S.A. 59:8-8a.  If a plaintiff fails to comply with this

requirement, he is "forever barred from recovering against a public entity or public employee."

*See* N.J.S.A. 59:8-8.  The notice must state "[t]he date, place and other circumstances of the

occurrence or transaction which gave rise to the claim asserted" and provide "[a] general

8

description of the injury, damage or loss incurred so far as it may be known at the time of presentation of the claim."  N.J.S.A. 59:8-4c & d.  As both the New Jersey Supreme Court and courts of this district have recognized, failure to provide notice under the NJTCA waives a claim, even if the officer would not be entitled to immunity otherwise.  *See, e.g.*, *Velez v. City of Jersey City*, 180 N.J. 284, 294–95 (2004); *Evans v. Gloucester Twp.*, -- F. Supp. 3d --, Civ. No. 14-7160 (JBS/JS), 2015 WL 5012593, at *10 (D.N.J. Aug. 21, 2015).

Plaintiffs complied with this requirement by filing a notice of claim with the City of Vineland.  (Notice of Claim (Municipal Defs.' Mot. Ex. M; Off. Defs.' Mot. Ex. T).)  However, the notice only claims causes of action related to an "accident or occurrence" where "Vineland police entered claimant's residence without an arrest warrant and assaulted him by tackling him to the floor and while one officer held him down, the other officer repeatedly punched the claimant in and about his face and head, bruising his head, blackening his eyes, and fracturing his nose in the presence of Sherie Panarello, his wife, and their 2 year old daughter."  (Notice of Claim at 1–2.)  Panarello further wrote that the "negligence or wrongful acts of the City agency and City employees which caused [his] damages" were that "Vineland Police unlawfully entered claimant's residence at 59 Yelkca Avenue,[7] Vineland NJ 08360, and used excessive and un[n]ecessary force against the claimant by repeatedly hitting the claimant about the face and head without just cause.  The claimant has suffered perm[a]nent injuries."  (*Id.* at 2.)

The Notice of Claim never refers to anything other than unlawful entry into Plaintiffs' home and excessive force at the time of Panarello's arrest.  Nowhere does the Notice of Claim mention transport to the police station, anything that occurred at the police station, spoliated

---

[7] The claim form accidentally refers to Plaintiffs' address as 59 Yelkca Avenue, which is actually the address of the Ramos Defendants.  Plaintiffs' address at the time was 57 Yelkca Avenue.

evidence, or anything related to Panarello's criminal prosecution, either explicitly or implicitly. Plaintiffs' argue that their notice is sufficient because everything arose out of Panarello's arrest, but that if they have not literally complied with the Notice requirement as to claims arising from events occurring after the arrest, they have substantially complied.  (Pls.' Cross Mot. Br. at 21–24; Pls.' Opp. to Muni. Defs.' Mot. at 32–35.)

The doctrine of substantial compliance can apply to NJTCA notice in the limited circumstances where "the notice, although both timely and in writing, had technical deficiencies that did not deprive the public entity of the effective notice contemplated by the statute." *D.D. v. Univ. of Med. and Dentistry of N.J.*, 213 N.J. 130, 159 (2013) (citations omitted).  "The doctrine requires the *moving party* to show:  (1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim; and (5) a reasonable explanation why there was not strict compliance with the statute."  *Ferreira v. Rancocas Orthopedic Assocs.*, 178 N.J. 144, 151 (2003) (emphasis added) (internal quotations and citations omitted).  With respect to the purposes of the NJTCA, the New Jersey Supreme Court has held that the two central purposes of the NJTCA are (1) to restrict a public entity's liability in tort, and (2) to create a relatively short notice filing period to enable the public entity to investigate and settle claims. *Velez*, 180 N.J. at 294 (citations omitted).

Plaintiffs have shown a series of steps taken to comply with the statute, as they literally complied with the NJTCA for Plaintiffs' claims for damages relating to the act of arresting Panarello and the entry onto Plaintiffs' property.  The notice was timely and in writing, making the issue whether the VPD and the officers were provided the effective notice for claims subsequent to Panarello's arrest.  In this instance, Plaintiffs' specificity regarding claims for the

10

warrantless entry and excessive force are at the detriment to their arguments that the VPD and the Officer Defendants should have been on notice that they would also be making claims regarding actions subsequent to Panarello's arrest.  Plaintiffs also fail to present any affirmative support for their position that they have substantially complied with the notice requirements of the NJTCA.  The description of the incident they provide fails to put the City of Vineland on notice that it would be defending against claims relevant to conduct taking place after the arrest and warrantless entry into Plaintiffs' home.  Plaintiffs have made no showing towards satisfying the other components a party seeking safe harbor under the doctrine of substantial compliance must prove, and so the doctrine of substantial compliance does not save their failure to literally comply with the NJTCA.[8]

Notice under the NJTCA is not required for either NJCRA claims or § 1983 claims, but is required for common law tort claims.  *See Velez*, 180 N.J. at 295–96.  Accordingly, the Municipal Defendants' Motion and the Officer Defendants' Motion will be granted with respect to the state law tort claims for assault and battery dealing with transport of Panarello from Plaintiffs' property to the police station, for assault and battery for the use of the OC spray on Panarello at the police station, for spoliation or concealment of evidence, for abuse of process, and for malicious prosecution.[9]  To the extent that any of the same facts underlying these state law torts provide the basis for a claim under the NJCRA or §1983, they will be analyzed under the appropriate standards for those claims.

---

[8] Plaintiffs are correct that both *Bullock v. Cabasa*, Civ. No. 10-1412 (RBK/AMD), 2013 WL 6253432 (D.N.J. Dec. 4, 2013) and *Catlett v. N.J. State Police*, Civ. No. 12-153 (JBS/AMD), 2012 WL 3757005 (D.N.J. Aug. 28, 2012) are distinguishable.  However, simply being distinguishable does not carry Plaintiffs' argument for substantial compliance.

[9] The Court will not reach the additional arguments made for dismissal of these state law tort claims, such as statute of limitations arguments or the merits of the claims.

**B.      Constitutional Claims Against Individual Actors Under 42 U.S.C. §§ 1983, 1985, and 1986 and the NJCRA**

Plaintiffs have alleged violations of their constitutional rights under both the United States Constitution and the New Jersey Constitution.  The analysis under § 1983 for alleged violations of the United States Constitution is the same as the analysis under the NJCRA for alleged violations of the New Jersey Constitution.  *See Hottenstein v. City of Sea Isle City*, 977 F. Supp. 2d 353, 365 (D.N.J. 2013); *Rezem Family Assocs., LP v. Borough of Millstone*, 423 N.J. Super. 103, 115 (App. Div. 2011).  Accordingly, Plaintiffs claims under § 1983 and the NJCRA will be discussed concurrently.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States."  *Morrow v. Balaski*, 719 F.3d 160, 165–66 (3d Cir. 2013) (citing *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc)).  There can be no dispute that the named defendants were acting under the color of state law, as they were sworn officers responding to a report of an alleged assault and investigating the crime at the time.  (*See* Pls.' Responsive SMF at 2; Off. Defs.' Mot. Br. at 7.)  Therefore, the Court must only determine if there is undisputed evidence that their conduct violated a constitutional right.

Regarding the constitutional claims, the Municipal Defendants and the Officer Defendants have moved for summary judgment to dismiss all constitutional claims against them,[10] and Plaintiffs have cross moved for summary judgment in their favor on the Fourth Amendment claims.

---

[10] No defendant has moved for summary judgment on the grounds of qualified immunity. Accordingly, all analyses will be on the merits of the claims and not about whether the officer violated a clearly established constitutional right at the time of the challenged conduct.  *Cf.*

### 1. Conspiracy Claims

Plaintiffs concede that they have failed to satisfy their evidentiary burden for any conspiracy claims under 42 U.S.C. § 1985 and any failure to prevent a § 1985 conspiracy under 42 U.S.C. § 1986 as to the moving defendants.  (Pls.' Cross Mot. Br. at 27; Pls.' Opp. to Muni. Defs.' Mot. Br. at 26.)  Accordingly, the Municipal Defendants' Motion and the Officer Defendants' Motion are granted in this respect.[11]

However, Plaintiffs still maintain that a conspiracy existed both under § 1983 and under state common law to unlawfully prosecute Panarello.  (Pls.' Cross Mot. Br. at 27; Pls.' Opp. to Muni. Defs.' Mot. Br. at 25–27.)  Specifically, the conspiracy alleged is one "to violate Plaintiffs' constitutional rights, and evidence of the same is the Defendants' failure to properly investigate the crime scene and their failure to secure video surveillance of the incident."  (Pls.' Cross Mot. Br. at 27; Pls' Opp. to Muni. Defs.' Mot. at 25–27.)  Plaintiffs point to no affirmative evidence of a conspiracy, merely incorporating by reference all previous arguments made, and "assert[ing] that there are genuine material disputes of fact when it comes to the actions of the officers during the arrest and subsequent to the arrest of John Panarello."  (Pls.' Opp. to Muni. Defs.' Mot. at 29.)  Even looking back in their briefs to find the evidence apparently incorporated by reference, all sections of the brief dealing with any conspiracy rely on mere assertions and the pleadings.  (*See, e.g.*, Pls.' Opp. to Muni. Defs.' Mot. at 25–26.)

---

*Michtavi v. Scism*, 808 F.3d 203, 206 (3d Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).

[11] Count V, which also alleges a violation of 42 U.S.C. §§ 1985 and 1986 is against only the Ramos Defendants, who have not moved this Court for any relief.  Accordingly, Count V will remain unless voluntarily dismissed by Plaintiffs pursuant to Fed. R. Civ. P. 41(a).

At this procedural juncture, Plaintiffs must do more than rely on the bare pleadings to support their position and must put forth and point to evidence in support of their claims. *See Celotex*, 477 U.S. at 324 ("Rule 56[ ] therefore requires the nonmoving party *to go beyond the pleadings* and . . . designate specific facts showing that there is a genuine issue for trial." (emphasis added) (internal quotations omitted)). Plaintiffs have failed to put forth any evidence, and the evidence submitted by the Municipal Defendants and adopted by the Officer Defendants defeats any claim of a conspiracy made by Plaintiffs. Plaintiffs' own expert, Mr. Mickie McComb testified at deposition:

> *I'm not saying it's a conspiracy.* I'm saying it's a pattern of behavior and a pattern of again let me go out each time they conveniently don't have video of—they didn't collect the video. . . . They didn't—when they were ID'ing the scene, they didn't take any picture where the—the entrance on the floor of the house, injuries of the—of Mr. Panarello, none of the officers. They conveniently left certain aspects of the case out. They left— . . . They didn't follow proper police procedures when collecting evidence. They didn't collect everything. They chose, for whatever reason, the ID people or Sergeant Riggione who was in charge of that ID officer, to not take pictures of every single thing. And that's—that's not consistent with what an ID person or unit would do in a police—you know, or any investigation, the scene of a so-called crime.

(McComb Dep. Tr. (Muni. Defs.' Ex. R) at 288:5–289:2) (emphasis added). Mr. McComb clearly believes there were issues with the investigatory procedures, but he repeats at least twice more in his testimony that there was no conspiracy. (*See* McComb Dep. Tr. at 295:16–17 ("I am not saying it was a conspiracy. I am saying [certain investigatory procedures were] conveniently left out."); 295:25–296:4 ("I'm not saying it's conspiracy. It's for the purpose of covering up the investigation and charging Mr. Panarello based on the totality of the circumstances.").) Plaintiffs provide nothing to rebut these assertions, and seemingly cannot as Mr. McComb is their own expert on whom they have relied in this case.

Without affirmative evidence from Plaintiffs and evidence from their own expert asserting repeatedly that no conspiracy existed, the claims for a conspiracy to deprive Panarello of rights under § 1983 fail, and so does the claim for a common law conspiracy. Accordingly, the Municipal Defendants' Motion and the Officer Defendants' Motion will be granted in this respect, and the § 1983 claim as it pertains to a conspiracy will be dismissed, as will the common law conspiracy claim.

### 2.      Fourth Amendment Search and Seizure

Plaintiffs complain of three distinct Fourth Amendment issues here: (1) whether the officers unlawfully entered the driveway on Plaintiffs' property before arresting Panarello; (2) whether the officers unlawfully entered Plaintiffs' backyard to arrest Panarello; and (3) whether the officers unlawfully arrested Panarello. The FAC alleges that Officer Laielli, Officer Shaw, Officer Armstrong, and Detective Riggione all unlawfully entered the property, and that Officers Laielli, Shaw, and Armonstrong unlawfully seized and arrested Panarello. Both the Officer Defendants and Panarello have moved for summary judgment on these issues. For the reasons that follow, the Court will grant the Officer Defendants' Motion only with respect to the entry into the driveway. The Officer Defendants' Motion and the Plaintiffs' Cross Motion will otherwise be denied, as explained.

"[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). "Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property." *Estate of Smith v. Marasco*, 318 F.3d 497, 518–19 (3d Cir. 2003) (citing *United States v. Dunn*, 480 U.S. 294, 300–01 (1987)). The Supreme Court has explained that the curtilage is the "area around the home [that] is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy

15

expectations are most heightened.'"  *Jardines*, 133 S. Ct. at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)).  However, Fourth Amendment protection must turn on a reasonable expectation of privacy and not adhere strictly to concepts of property.  *United States v. Correa*, 653 F.3d 187, 191 (3d Cir. 2011).

Before reaching the merits of the claims, the Court must be certain that it is permitted to entertain these Fourth Amendment claims in light of Panarello's arrest and subsequent conviction.  This Court is bound by the determination of the Glassboro Municipal Court as affirmed by the New Jersey Superior Court that Panarello was indeed resisting arrest.  "[I]n a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).  If the § 1983 suit necessarily constitutes a collateral attack on Panarello's conviction, then the claim must be dismissed as a matter of law.  *See id.* at 486–87.  Judge Smith of the Superior Court determined that Panarello "was told he was under arrest, and that [Panarello] continued to kick and flail in spite of being told he was under arrest.  Because [Panarello] was told he was under arrest and continued to resist, there were sufficient facts on which to base a resisting arrest conviction."  Order Aff'g Conviction ¶ 5a, *State v. Panarello*, Muni. Appeal No. A-28-13 (N.J. Super. Ct. Law Div. June 24, 2014).[12]

---

[12] The record additionally reveals that Panarello was convicted by Judge Golden in Glassboro Municipal Court of the disorderly persons offense of assault for spitting on the EMT who attempted to administer treatment to him after he was sprayed with OC spray.  *See* Order Aff'g Conviction ¶¶ 1–2; *see also* Trial Decision Tr. at 35:9–36:10, *State v. Panarello* (Glassboro Muni. Ct. Sept. 26, 2013).  This finding was not appealed to the Superior Court.  Order Aff'g Conviction ¶ 3.

The Court in *Heck* specifically addressed, in dicta, what would happen if a criminal defendant were convicted of resisting a lawful arrest and then brought a suit under § 1983 seeking damages under his Fourth Amendment right to be free from unreasonable seizures. *Heck*, 512 U.S. at 486 n.6.  The Court said that this action would not lie.  *Id.*  However, this turned on the definition of resisting arrest as "intentionally preventing a peace officer from effecting a *lawful* arrest."  *Id.* (emphasis in original).

In New Jersey, the legislature has made clear that even an unlawful arrest can be the basis for a charge of resisting arrest so long as the officer "was acting under color of his official authority and provided the law enforcement officer announces his intention to arrest prior to the resistance."  N.J.S.A. 2C:29-2a.  The New Jersey Supreme Court has also explained that "[b]y the express terms of the resisting arrest statute, a person has no right to resist arrest by flight or any other means, *even if the arrest constitutes an unreasonable seizure under the constitution*."  *State v. Reece*, 222 N.J. 154, 173 (2015) (emphasis added) (quoting *State v. Crawley*, 187 N.J. 440, 453 (2006)) (internal quotation marks and alterations omitted).  Thus, New Jersey has contemplated that this course of conduct may occur, and specifically instructed an aggrieved defendant such as Panarello to bring the instant suit.  *See State v. Mulvihill*, 57 N.J. 151, 155–56 (1970) ("[I]n our State, when an officer makes an arrest, legal or illegal, it is the duty of the citizen to submit and, in the event the seizure is illegal, *to seek recourse in the courts for the invasion of his right of freedom*.") (emphasis added).  This feature of New Jersey law makes the *Heck* doctrine inapplicable to Panarello's Fourth Amendment claim of illegal seizure, and accordingly will not bar this claim.

Additionally, none of Panarello's convictions preclude a finding of an unlawful search under the *Heck* doctrine.  The Court in *Heck* also addressed this issue in dicta, noting that "a suit

for damages attributable to an allegedly unreasonable search may lie even if the challenged

search produced evidence that was introduced in a state criminal trial resulting in the § 1983

plaintiff's still-outstanding conviction." *Heck*, 512 U.S. at 487 n.7.  This type of suit may only

lie if it "will *not* demonstrate the invalidity of any outstanding criminal judgment." *Id.* at 487

(emphasis in original).  Because Panarello's arrest need not be lawful under the resisting arrest

statute, it does not matter whether the police were lawfully on his property in the process of

effecting the arrest.  Thus, any finding of unlawful entry would not invalidate his conviction for

resisting arrest.  The Court will now consider the merits of the claims.

### i.       Initial Entry onto the Property

The parties dispute whether the driveway constitutes the curtilage.  Officers Laielli and

Shaw argue that at the time they entered Plaintiffs' property, they were in his driveway, and

preparing to approach the front door in order to contact Panarello to conduct their investigation.

(Off. Defs.' Mot. Br. at 11; Off. Defs.' SMF ¶¶ 55–60.)  Plaintiffs contend that any entry onto

the property, including the driveway, was unlawful.  (Pls.' Cross Mot. Br. at 40–41.)  The

Officers counter that they are permitted to be on the driveway as it a place of usual ingress and

egress.  (Off. Defs.' Reply Br. at 3.)

Of relevance to the Court's analysis is an understanding of the property.  Plaintiffs

explain that their property was fenced in and that the driveway leading to the back of the

property was "not open and inviting to the public."  (Pls.' Cross Mot. SMF ¶ 38.)  Plaintiffs also

explain that "the public is only invited onto the property via the walkway to the front door."  (*Id.*

¶ 41.)  Looking at the photograph of Plaintiffs' property submitted by Plaintiffs, it is obvious that

the walkway to the front door connects to the driveway.  (Pls.' Cross Mot. Ex. A.)[13]  Therefore,

one must necessarily enter the driveway in order to access the walkway to the front door.

It is well settled that officers may approach the front door to investigate a complaint.  *See*

*Jardines*, 133 S. Ct. at 1416 ("[A] police officer not armed with a warrant may approach a home

and knock, precisely because that is 'no more than any private citizen might do.'") (quoting

*Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011)).  On Plaintiffs' property, to approach the front

door, the officers necessarily needed to walk down the driveway.  No Fourth Amendment

violation can rise from this entry onto the driveway.  On this issue, the Officer Defendants'

Motion will be granted, and the Plaintiffs' Cross Motion denied.

### ii.       Entry into the Backyard and Arrest

The Court next turns to the entry into the backyard which is apparently predicated upon

the subsequent arrest of Panarello.  From the driveway, where he was lawfully permitted to be,

Officer Laielli spotted Panarello in the backyard and called out "Yo, I need to talk to you."  (*See*

Off. Defs.' SMF ¶¶ 59–60; Pls.' Cross Mot. SMF ¶ 28.)  In response, Panarello moved away

from the officers and toward his home.  (Off Defs.' SMF ¶ 62; Pls.' Cross Mot. SMF ¶¶ 26–

28.)[14]  From the view of the officers, this action constituted an act of fleeing and they believed

that Panarello was now committing the offense of obstruction, in violation of N.J.S.A. 2C:29-1.

---

[13] The Officer Defendants also submit photos that confirm this.  (*See* Off. Defs.' Ex. W, X.)

[14] The parties dispute how to characterize Panarello's conduct.  The Officers contend that he
"took off running" (Off. Defs.' SMF ¶ 62), while Panarello counters that he merely "began
moving towards the back door of his residence intending to enter his home and not talk to police
at that time."  (Pls.' Resp. to Off. Defs.' SMF ¶ 62.)  This point is immaterial to the ultimate
analysis.

[15] (*See* Off. Defs.' SMF ¶ 63.)  Officers Laielli and Shaw then proceeded into the backyard to arrest Panarello for obstruction.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted).  However, exceptions to this presumption do exist, though there are only "a few specifically stablished and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 573, 586 (1980) (internal quotation marks omitted).  This same principle extends to the curtilage, as explained above.  Thus, this Court must presume that the warrantless search of the curtilage was unreasonable.

It is undisputed by the parties that the Plaintiffs' backyard constitutes the curtilage of Plaintiffs' home.  (*See* Off. Defs.' Mot. Br. at 10–11; Pls.' Cross Mot. Br. at 38–41.)  Plaintiffs' argument is simply that any entry into his backyard was unjustified.  (Pls.' Cross Mot. Br. at 29–30.)  The Officer Defendants put forth two primary theories to justify their conduct:  (1) the backyard led to the back door, which they believed was used by visitors, so their entry was permitted in the same way access to the front door is permitted (Off. Defs.' Mot. Br. at 10–11); and (2) Panarello was exposed to public view at the time he committed the crime of obstruction, so the officers were permitted to follow him as he retreated in order to effect an arrest that would have been lawful had he stayed put.  (Off. Defs.' Reply Br. at 3–6.)[16]  As will be explained, the

---

[15] The elements of this crime are discussed in Section IV.B.2.ii.b, *infra*.

[16] The Officer Defendants have not argued any theory of exigent circumstances, although Plaintiffs cross moved for summary judgment that exigent circumstances do not justify the warrantless entry.  (*See* Pls.' Cross Mot. Br. at 34–36.)  The Officer Defendants do not respond to Plaintiffs Cross Motion on this point.

facts submitted do not support the first theory, and there are disputed facts that make this Court unable to decide if the second theory can support the claim.

### a.     Entry Under Theory of Customary Access

There is no evidence to suggest that the officers believed the back door was the common route of entry to the home, nor is there evidence to support that the back door was publicly accessible.  The Supreme Court has explicitly reserved judgment on the issue of whether a "knock and talk" is permitted at any entrance open to visitors.  *See Carroll v. Carman*, 135 S. Ct. 348, 352 (2014) (per curiam).  However, the Court in *Carroll* explained, without approving or disapproving, that other lower courts had found the Fourth Amendment not implicated when officers believe the door to be readily accessible to the public.  *See id.* (gathering cases).  The Officer Defendants submit no evidence regarding the path from the driveway to the back door. The only evidence on this point comes from Plaintiffs who submit that there was no walkway on the side or along the back of the Panarello residence.  (Pls.' Resp. to Off. Defs.' SMF at 3.)  The back door is not visible to the public from the roadway, only the front door and the path to the front door.  (*See* Pls.' Cross Mot. Ex. A; *see also* Off. Defs.' Ex. W, X.)  The Officer Defendants also fail to argue that they had a reasonable belief the back door was used by visitors, merely stating the legal proposition that a law enforcement officer may approach a back door when they have such a reasonable belief without explaining how this proposition applies here.  (*See* Off. Defs.' Mot. Br. at 11.)

The cases cited to by the Officer Defendants in support of their position are distinguishable.[17]  Further, the cases all predate the Supreme Court's decision from March 2013

---

[17] The Officer Defendants cite primarily to *State v. Johnson*, 171 N.J. 192 (2002).  However, the focus of the court's decision in *Johnson* was the front porch of a multi-occupancy dwelling where multiple persons unrelated to the defendant were occupying the front porch at the time the

in *Jardines*.  The Court in *Jardines* held that the front porch of a single family home was space

protected by the Fourth Amendment as a "classic exemplar" of the curtilage.  *See Jardines*, 133

S. Ct. at 1414–15.  The Court affirmed the Florida Supreme Court in finding a search of the front

porch with a drug dog to be a violation of the Fourth Amendment's protection against

warrantless searches of the home.  *Id.* at 1417–18.  This was as opposed to the line of cases that

had permitted searches by drug dogs of cars during traffic stops.  *See id.* at 1419 n.1 (Kagan, J.,

concurring).  The facts and circumstances presented here do not support a finding that the Officer

Defendants' entry was justified as a matter of law.  This theory cannot defeat Plaintiffs' Cross

Motion, nor can it support the Officer Defendants' Motion.

### b.  Entry Under Theory of Effecting Arrest

For the theory of entry into the backyard to effect an arrest, the facts are intertwined with

the facts surrounding the warrantless arrest of Panarello.  The Officer Defendants argue that once

they saw Panarello and ordered him to stop, they had successfully placed him under an

investigatory detention pursuant to their reasonable suspicion that he had committed a crime.

They continue that when he fled, they then had probable cause to believe that Panarello was

committing a crime, and they could enter the backyard to arrest him for that crime.  (Off. Defs.'

Mot. Br. at 12.)  Panarello counters by arguing that any entry onto his property was

unconstitutional.  (Pls.' Cross Mot. Br. at 29.)

---

officers entered the porch.  *See Johnson*, 171 N.J. at 209–10.  The Officer Defendants
additionally rely on *United States v. Garcia*, 997 F.2d 1273, 1279–80 (9th Cir. 1993), where
officers went to the back door of a home reasonably believing it to be the front door and
provided reasons for the belief, *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984), which
involved warrantless entry into *commercial* property, and *United States v. Daoust*, 728 F. Supp.
41, 42–46 (D. Me. 1989), which involved officers walking around a home trying to find the front
door to a home where no path existed around the home.

The officers had probable cause to arrest Panarello for obstruction based on his retreat from the officers during an investigation of an alleged assault.  "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."  *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005) (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972)).  "Therefore, the evidentiary standard for probable cause is significantly lower than the standard which is required for conviction."  *Id.* (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).  The offense of obstruction, as defined by N.J.S.A. 2C:29-1a, is committed when one "purposely . . . prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight . . . ."  Here, Officers Laielli and Shaw were attempting to investigate an alleged assault, which constituted "lawfully performing an official function" under the statute.  *See Reece*, 222 N.J. at 171 (citing *Crawley*, 187 N.J. at 460–61).  Panarello's moving away from the officer, even if not running away, still provides the necessary probable cause to believe that obstruction has occurred.  *See Crawley*, 187 N.J. at 460–61 & n.7 ("[A]ny flight from police detention is fraught with the potential for violence because flight will incite a pursuit . . . .").  Thus, even viewing the facts in the light most favorable to the Plaintiffs, the low threshold of probable cause existed for Officers Laielli and Shaw to find that Panarello committed the offense of obstruction.

Panarello committed the act of obstruction in front of the officers, making it permissible for them to arrest Panarello without a warrant if he was in a public place.  *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."); *State v. Dangerfield*, 171 N.J. 446, 460

(2002) (finding that N.J.S.A. 40A:14-152 permits officers to perform warrantless arrests for "disorderly and petty disorderly persons offenses that occurred in their presence").

If a person is in a public place when the officers went to effect the arrest, he cannot avoid the arrest by retreating to a place of safety. *See United States v. Santana*, 427 U.S. 38, 42 (1976) ("The only remaining question is whether [the defendant's] act of retreating into her house could thwart an otherwise proper arrest. We hold that it could not."). Thus, the issue becomes if Panarello was in a public place at the time he acted in a manner that gave the officers probable cause to arrest him, then the warrantless entry into the yard and subsequently the house in effecting his arrest as well as the arrest itself are proper under the Fourth Amendment.

The Officer Defendants rely heavily on the decision of the New Jersey Superior Court, Appellate Division in *State v. Nikola*, 359 N.J. Super. 573 (App. Div. 2003), and that court's interpretation of the Supreme Court's decision in *United States v. Santana*, 427 U.S. 38 (1976). In *Santana*, after an undercover investigation, officers encountered the defendant standing in the front doorway of her home with evidence of felony drug distribution in her hand. *Santana*, 427 U.S. at 40. Once the officers identified themselves, she retreated into her home, and the officers pursued her into the home to arrest her. *Id.* at 40–41. The Court in *Santana* determined that the defendant in the threshold was in public view. *Id.* at 42. Relying on this, the court in *Nikola* found that a defendant suspected of driving under the influence standing in the entryway to her garage at the end of her front driveway was in a public place. *Nikola*, 359 N.J. Super. at 582–83.

However, following the decision in *Santana*, the Court held in *Welsh v. Wisconsin*, 466 U.S. 740 (1984), that "[w]hen the government's interest is only to arrest for a minor offense, that presumption of unreasonableness [for a warrantless home entry] is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon

24

probable cause by a neutral and detached magistrate." 466 U.S. at 750. Here, the officers arrested Panarello based on what they believed to be his commission of the offense of obstruction, which Officer Laielli filed as a disorderly persons offense. (*See* Off. Defs.' Ex. N, Compl. 2010-3105.) This is precisely the kind of minor offense that the Court in *Welsh* contemplated.

The Court is not persuaded that a person standing in the front door threshold with evidence of a felony or a person standing in the threshold of her garage at the end of her front driveway suspected of driving under the influence are sufficiently factually similar to a person in his backyard suspected of a disorderly persons crime of obstruction. Looking at the facts, analysis, and reasoning in *Santana* and *Nikola*, the issue to the Court appears to be whether a public passerby would have been able to see Panarello in the backyard from the street. If Panarello were visible from a public passerby, then the warrantless entry into the backyard is justified to effect the arrest. Otherwise, both the warrantless entry into the backyard and the warrantless arrest within the curtilage are unlawful under the Constitution.

The parties have cross moved for summary judgment on this issue, meaning neither movant benefits from any inferences. Looking at the undisputed facts, no one has identified to this Court where precisely in the backyard Panarello was standing. All that can be agreed upon is that Panarello was somewhere in the backyard visible to the police from somewhere on the driveway. (Pls.' Cross Mot. SMF ¶¶ 27–28; Off. Defs.' SMF ¶¶ 59–60.) It is unclear whether Panarello could have been observed by a public passerby when seen by the officers committing what they believed to be obstruction. Because this is an issue of fact, summary judgment cannot be granted on this issue. Accordingly, both motions will be denied with respect to the warrantless entry and arrest due to the presence of a genuine issue of material fact.

3.      **Excessive Force**

Plaintiffs complain of three distinct instances of excessive force:  (1) the force used during Panarello's initial arrest to subdue him and handcuff him; (2) the conduct of the officer who drove him from his house to the police station; and (3) the use of the OC spray while Panarello was in the booking room at the police station.  (*See generally* FAC Counts I, II.)  The Officer Defendants move for summary judgment on the grounds that (1) their use of force was neither unlawful nor excessive at any time (Off. Defs.' Mot. Br. at 7–14); and (2)  the *Heck* doctrine bars any argument that there was excessive force at the time of his arrest (Off. Defs.' Mot. Br. at 15–16.)  The three uses of force will be analyzed in turn.

i.      **Standard for Excessive Force Claims**

The force used by the Officer Defendants at the time of arrest must be analyzed under the Fourth Amendment.  *See Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) ("[A]ll claims of excessive force by police officers, in the context of an arrest, investigatory stop, or other 'seizure,' should be analyzed under the Fourth Amendment.") (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  However, it is not clear what standard applies to the use of force during Panarello's transportation to the police station and the use of force at the police station.[18] The Supreme Court, first in *Graham v. Connor*, 490 U.S. 386 (1989) and most recently in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), made clear that excessive force claims made by pretrial detainees in state facilities are to be evaluated under the Fourteenth Amendment Due Process Clause.  *See Kingsley*, 135 S. Ct. at 2472–73.  Those cases have specificlly left open the

---

[18] Plaintiffs and the Officer Defendants appear to presume with stating as much that the Fourth Amendment governs all of Panarello's excessive force claims.  However, this Court has an obligation to apply the correct standard of law, regardless of what the parties request.

issue of when the subject of a criminal case transitions from the status of an arrestee—whose claims are evaluated under the Fourth Amendment—to a pretrial detainee—whose claims are evaluated under the Fifth or Fourteenth Amendment, as appropriate.  *See Kingsley*, 135 S. Ct. at 2479 (Alito, J., dissenting) (noting that the Fourth Amendment versus Due Process Clause issue is unsettled); *Graham*, 490 U.S. at 395 n.10 ("Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with the protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today.").

The Third Circuit has also not clarified the issue, but has found that the use of force by a police officer in the station house garage occurred during an arrest, and so would be analyzed under the Fourth Amendment, "[w]ithout deciding where an arrest ends and pretrial detention begins." *United States v. Johnstone*, 107 F.3d 200, 205–06 (3d Cir. 1997).[19]  Other regional circuit courts have determined that the Fourth Amendment continues to apply beyond even this point.  *See, e.g.*, *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (applying the Fourth Amendment to a plaintiff arrested without a warrant prior to any probable cause hearing); *Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011) (applying the Fourth Amendment "to incidents occurring during the transportation, booking, and initial detention of a recently arrested person"); *Aldini v. Johnson*, 609 F.3d 858, 865–67 (6th Cir. 2010) (applying the Fourth

---

[19] The Third Circuit has recently noted that it still has yet to "chisel more finely the lines between the two claims . . . [and] might be required to decide precisely where an unlawful seizure ends and a due process violation begins."  *Halsey v. Pfeiffer*, 750 F.3d 273, 291 (3d Cir. 2014) (internal quotations and alterations omitted).

Amendment for warrantless arrestees prior to a probable-cause hearing, relying on dicta in *Bell v. Wolfish*, 441 U.S. 520, 536 (1979)).[20]

Based on the Third Circuit's holding in *Johnstone*, this Court finds that any alleged use of force against Panarello during his transport to the police station must be analyzed under the Fourth Amendment. This Court also finds that because Panarello was arrested without a warrant, relying on the weight of authority from the other regional circuits, the Fourth Amendment applies to the alleged use of force while in the police station booking room.[21]

For a Fourth Amendment excessive force analysis, "whether there is a constitutional violation is properly analyzed under the Fourth Amendments' objective reasonableness standard." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007) (quoting *Graham*, 490 U.S. at 388) (internal quotation marks omitted). "The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'" *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting

---

[20] The Sixth Circuit in *Aldini* noted the existence of a circuit split on this issue. *See Aldini*, 609 F.3d at 864 & n.6 (collecting cases).

[21] The standard under both the Fourth Amendment and under the Fourteenth Amendment Due Process Clause appears to be the same—the test is one of objective reasonableness. *Kingsley*, 135 S. Ct. at 2473 (relying on the Fourth Amendment test of *Graham*, 490 U.S. at 396, to define the Fourteenth Amendment Due Process Clause test); *id.* at 2479 (Alito, J., dissenting) (noting that a Fourth Amendment claim "apparently would be indistinguishable from the substantive due process claim that the [majority] discusses"); *see also* Michael Avery et al., *Police Misconduct: Law & Litig.* § 2:18 (updated Nov. 2015). Thus, the analysis would be unaffected even if this Court's conclusion is incorrect regarding which amendment applies. But before an alleged violation of a constitutional right can be analyzed, "it is necessary to isolate the precise constitutional violation with which [the defendant] is charged." *Baker v. McCollan*, 443 U.S. 137, 140 (1979); *see also Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (requiring a determination that a right is secured by the Constitution before evaluating the claim) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

*Graham*, 490 U.S. at 397).  "[T]he 'reasonableness' of a particular use of force must be judged

from the perspective of a reasonable officer on the scene; Monday morning quarterbacking is not

allowed."  *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) (quoting *Graham*, 490 U.S.

at 396) (internal quotation marks omitted).  A court must consider "all of the relevant facts and

circumstances leading up to the time that the officers allegedly used excessive force."  *Rivas*, 365

F.3d at 198 (citing *Abraham v. Raso*, 183 F.3d 279, 291 (3d Cir. 1999)).  "Even where an officer

is initially justified in using force, he may not continue to use such force after it has become

evident that the threat justifying the force has vanished."  *Id.* at 184 (citations omitted).

However, "[t]he reasonableness of the use of force is normally an issue for the jury."  *Id.* (citing

*Abraham*, 183 F.3d at 290).

### ii.        Force at the Time of Arrest

The Officer Defendants argue that the *Heck* doctrine bars any claim by Panarello for

excessive force at the time of his arrest.  (*See* Off. Defs.' Mot. Br. at 15–16.)  Their argument is

that that the New Jersey court entered a finding rejecting Panarello's argument that he was

entitled to use self-defense,[22] so if the present claim were submitted to a jury that ultimately

found for Panarello, it would upend Panarello's conviction for resisting arrest because he *would*

be entitled to use self-defense against the unlawful force, a result which the *Heck* doctrine

---

[22] "This Court also found, after giving deference to Judge Golden's credibility finding that
[Panarello] continued to flail after being told he was under arrest and the record supporting a
finding that had appellant stopped resisiting then the force used by the police officer would also
have ceased, [Panarello]'s self-defense claim fails."  Order Aff'g Conviction ¶ 5b, *State v.
Panarello*, Muni. Appeal No. A-28-13 (N.J. Super. Ct. Law Div. June 24, 2014)

specifically prohibits, as explained in Section IV.B.2, *supra*.  This is because New Jersey law

permits an arrestee to use self-defense to resist an arrest effected through unlawful force.[23]

    The *Heck* doctrine does not automatically bar a § 1983 claim for excessive force for

effecting an arrest when the § 1983 plaintiff has been previously convicted of resisting the same

arrest.  *See Lora-Pena v. F.B.I.*, 529 F.3d 503, 506 (3d Cir. 2008) (per curiam); *Nelson v.

Jashurek*, 109 F.3d 142, 145–46 (3d Cir. 1997).  However, the relevant Third Circuit cases are

distinguishable from the instant case.  In *Nelson*, the plaintiff had been convicted of resisting

arrest under Pennsylvania law that only required the jury to find that the officer "was justified in

using 'substantial force.'"  109 F.3d at 145.  The Third Circuit held that "the fact that [the

officer] was justified in using 'substantial force' to arrest [the plaintiff] does not mean that he

was justified in using an excessive amount of force, and thus does not mean that his actions in

effectuating the arrest necessarily were objectively unreasonable."  *Id.*  Thus, the court reasoned

that *Heck* would not bar the claim.  *Id.* at 145–46.  Similarly, in *Lora-Pena*, "[t]he trial judge

instructed the jury in [the plaintiff]'s criminal case that in order to find [the plaintiff] guilty of

assaulting a federal officer, they had to determine that the officer was acting in the performance

of his official duties."  529 F.3d at 505.  The Third Circuit determined that "the question of

whether the officers used excessive force was not put before the jury. . . . Nowhere in the jury

instructions did the trial judge state that the jury must determine whether the officers used

excessive force against [the plaintiff]."  *Id.* at 506.  Accordingly, the court concluded that "the

rationale of *Heck* does not present an absolute bar."  *Id.*

---

[23] N.J.S.A. 2C:3-4b(1)(a) provides:  "The use of force is not justifiable under this section . . . [t]o resist an arrest which the actor knows is being made by a peace officer in the performance of his duties, although the arrest is unlawful, unless the peace officer employs unlawful force to effect such arrest . . . ."

In contrast to the plaintiffs in both *Nelson* and *Lora-Pena*, there is a specific finding from the New Jersey Superior Court that Panarello's self-defense claim failed when Judge Smith affirmed Panarello's conviction for resisting arrest. Order Aff'g Conviction ¶ 5b, *State v. Panarello*, Muni. Appeal No. A-28-13 (N.J. Super. Ct. Law Div. June 24, 2014). Additionally, the New Jersey Superior Court, Appellate Division, has held under the same rationale advanced by the Officer Defendants that where a plaintiff has pleaded guilty to resisting arrest, he has "forfeited any claim that defendants used excessive force in effecting his arrest" and his claims "are barred because a favorable outcome in the civil action would be inconsistent with the admissions he made by pleading guilty." *Bustamante v. Borough of Paramus*, 413 N.J. Super. 276, 295 (App. Div. 2010) (citations omitted). Although Panarello did not plead guilty and thereby admit he was not entitled to use force, the explicit finding of the Superior Court in his criminal case provides the same.

Therefore, this Court must agree with the Officer Defendants. Permitting this claim to go forth presents the possibility that if the jury were to find for Panarello on this issue, this would be a finding that directly contravenes the conclusions of the fact-finder from the criminal proceeding, which *Heck* does not permit. Accordingly, the Officer Defendants' Motion is granted with respect to the use of force during the arrest.

### iii. Force in Transporting Panarello to the Police Station

The accounts of the parties differ on the issue of what occurred during the transportation of Panarello to the police station. It is not in dispute that Officer Armstrong was the one who transported Panarello. (Off. Defs.' SMF ¶ 118; Pls.' Resp. to Off. Defs.' SMF at 14.) It is also apparently not in dispute that Panarello sustained additional injuries during the transport from Plaintiffs' property to the police station—the dispute is as to whose fault it is. (*See* Pls.' Resp. to

Off. Defs.' SMF at 14–15.)  Officer Armstrong argues that he merely transported Panarello, and that during the transport, he called for an EMT to meet them at the police station due to the injuries sustained during his arrest.  (Off. Defs.' SMF ¶¶ 117–19; Armstrong Dep. Tr. at 47:25–48:9, 49:23–51:2.)  Officer Armstrong also testified at the state criminal proceedings that Panarello was yelling and screaming in the back of the patrol car and was banging his head and upper body against the plexiglass.  (Trial Tr. vol. 2 (Off. Defs.' Ex. Q [Dkt. No. 164-20]) at 24:13–26:13.)  Plaintiffs, on the other hand, claim that Panarello was placed unrestrained into the back of the police vehicle following his arrest, and that Officer Armstrong purposefully accelerated and braked abruptly in order to cause him further injury.  (Pls.' Resp. to Off. Defs.' SMF at 14–15; Panarello Aff. ¶¶ 8–9.)

This constitutes a genuine issue of material fact, as the parties dispute the responsibility for Panarello's additional injuries.  This dispute only be resolved by weighing the credibility of the witnesses, which the Court cannot and must not do at this procedural juncture.  *Anderson*, 477 U.S. at 255.  Accordingly, the Officer Defendants' Motion with respect to this issue will be denied.

### iv.  Use of the OC Spray in the Police Station Booking Room

Again, the accounts of the parties differ on what led up to the use of the OC spray in the booking room.  Not in dispute is the fact that Officers Armstrong and Day were present, and Officer Day is the one who deployed the OC spray.  (Off. Defs.' SMF ¶¶ 121–27; Pls.' Resp. to Off. Defs.' SMF at 15–16.)  Officers Armstrong and Day submit that after Officer Armstrong took Panarello into the police station, Panarello was yelling his name and Social Security number, but that Officer Armstrong removed Panarello's handcuffs, and then instructed him to sit down on a bench to be secured by handcuffs to the wall.  (Off. Defs.' SMF ¶¶ 124–26;

Armstrong Dep. Tr. at 51:13–53:16, 55:9–25; Day Dep. Tr. at 52:23–54:9, 57:18–62:19.)  They

claim that Panarello "raised his fists and took an aggressive posture" and refused to follow orders

to sit down on the bench after being instructed to do so repeatedly.  (Off. Defs.' SMF ¶¶ 125–27;

Armstrong Dep. Tr. at 56:1–13; Day Dep. Tr. at 62:8–19.)  Officers Armstrong and Day then

claim Officer Day decided to use OC spray to obtain compliance from Panarello rather than

engage in a physical altercation.  (Off. Defs.' SMF ¶¶ 127–28; Armstrong Dep. Tr. at 56:14–17;

Day Dep. Tr. at 62:20–63:3.)  Officer Armstrong further submits that he gave Panarello paper

towels to wipe his face, but that Panarello refused and instead yelled his name and Social

Security number over and over.  (Off. Defs.' SMF ¶¶ 131–32; Armstrong Dep. Tr. at 60:17–

62:7.)  Plaintiffs conversely claim that the OC spray was administered after Panarello was

already secured by handcuffs to the wall and while we was in a semi-conscious state.  (Pls.'

Resp. to Off. Defs.' SMF at 15–16; Panarello Aff. ¶ 10.)

　　　This too constitutes genuine issues of material fact, regarding both the timing of the use

of the OC spray and the events leading up to its use.  Again, the dispute can only be resolved by

judging the credibility of the witnesses, and accordingly the Officer Defendants' Motion with

respect to this issue will be denied.

### 4.　　Retaliatory Complaints, Malicious Prosecution, and Abuse of Process

　　　Plaintiffs advance as a theory of liability under § 1983 the fact that all of the Officer

Defendants as well as Sergeant Riggione filed false police reports with the purpose of retaliating

against Panarello for filing complaints against Ramos in violation of his First, Fourth, and

Fourteenth Amendment rights.  (FAC Count II ¶¶ 5–6.)  The Officer Defendants and Municipal

Defendants move for summary judgment on the entirety of Count II of the FAC.  The Officer

Defendants appear to argue that this allegation would fall within the claims for malicious

prosecution and abuse of process.  (*See* Off. Defs.' Mot. Br. at 21–24.)  The Municipal

Defendants argue that Sergeant Riggione was not involved in the process of arresting or charging

Panarello, the claim must be dismissed as to Sergeant Riggione.  (Muni. Defs.' Mot. Br. at 37.)

They also argue that because the FAC include an allegation of a conspiracy in these paragraphs,

that this theory of liability must be dismissed for failure of proof of a conspiracy.  (Muni. Defs.'

Mot. Br. at 37–38.)

As an initial matter, as will be explained below, Sergeant Riggione was explicitly

involved in the process of charging Panarello, so the Municipal Defendants' argument on this

point is incorrect.  With respect to construing the claim, the Court agrees with the Officer

Defendants, and will construe this theory of liability to encompass malicious prosecution and

abuse of process in violation of the Constitution.  Further, to the extent this allegation presents a

theory of liability for retaliation under the First Amendment against the defendants who authored

criminal complaints based on Panarello's earlier internal affairs complaint against Ramos, no

party has briefed this issue or has made an application for relief on this theory.  Therefore, any

such claim survives summary judgment.

### i.   Malicious Prosecution

In this circuit, a claim for malicious prosecution under § 1983 must establish "(1) the

defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor;

(3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or

for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation

of liberty consistent with the concept of seizure as a consequence of a legal proceeding."

*Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009) (quoting *Estate of Smith*, 318 F.3d at 521)

(internal quotations omitted).

The crux of the dispute over this claim between the parties appears to be whether the criminal proceedings terminated in Panarello's favor.  In order to find that the criminal proceeding ended in plaintiff's favor in the situation where plaintiff has been charged with multiple crimes and convicted of some and acquitted of others, "upon examination of the entire criminal proceeding, the judgment must indicate the plaintiff's innocence of the alleged misconduct underlying the offenses charged."  *Id.* at 188.  The Third Circuit has counseled that "district courts need not reach the probable cause element unless they first make a finding of favorable termination after examining whether the proceeding as a whole indicates the innocence of the accused with respect to the conduct underlying all of the charges."  *Id.* at 194.

The parties do not, and cannot, dispute the record from the trial court.  As noted above, Panarello was convicted of resisting arrest in violation of N.J.S.A. 2C:29-2a and assault on the EMT who came to treat him in violation of N.J.S.A. 2C:12-1b(5)(c).  *See* Trial Decision Tr., *State v. Panarello*, (Glassboro Muni. Ct. Sept. 26, 2013); Order Aff'g Conviction, *State v. Panarello*, Muni. Appeal No. A-28-13 (N.J. Super. Ct. Law Div. June 24, 2014).  Officer Armstrong only authored the criminal complaint against Panarello for assault on the EMT.  (Off. Defs.' SMF ¶ 136; Off. Defs.' Ex. N, Compl. 2010-3102.)  Officer Laielli authored the criminal complaint for resisting arrest.  (Off. Defs.' SMF ¶ 138; Off. Defs.' Ex. N, Compl. 2010-3104.)  Where Panarello was actually convicted of the crime, it is clear that no liability for malicious prosecution can lie.  Accordingly, Officer Armstrong can have no liability for malicious prosecution, having authored no other criminal complaints,[24] and Officer Laielli can have no

---

[24] Plaintiffs initially asserted that Officer Armstrong also authored the criminal complaint for the charge of obstruction.  (*See* FAC Count II ¶  5.)  In light of the actual criminal complaints entered into the record for these motions, it is clear that Officer Armstrong signed no other criminal complaints.  (*See* Off. Defs.' Ex. N.)

liability for malicious prosecution with respect to the complaint for resisting arrest.  Further, Officer Day did not author *any* criminal complaints.  (*See* Off. Defs.' Ex. N.)  Therefore, he too can have no liability for malicious prosecution having failed to initiate any criminal proceedings.

The remaining five criminal complaints were authored by Officers Laielli and Shaw and Sergeant Riggione.[25]  Officer Laielli authored the complaint charging Panarello with aggravated assault for striking him, in violation of N.J.S.A. 2C:12-1b(5)(a) (Off. Defs.' SMF ¶ 135; Off. Defs.' Ex. N, Compl. 2010-3101), and the complaint for obstruction in violation of N.J.S.A. 2C:29-1a (Off. Defs.' SMF ¶ 139; Off. Defs.' Ex. N, Compl. 2010-3105).  Officer Shaw authored the complaint charging Panarello with aggravated assault for striking him, in violation of N.J.S.A. 2C:12-1b(5)(a).  (Off. Defs.' SMF ¶ 134; Off. Defs.' Ex. N, Compl. 2010-3100.) Sergeant Riggione authored the complaint charging Panarello with aggravated assault for his attempt to hit Ramos, in violation of N.J.S.A. 2C:12-1b(2), and for possessing the board with the purpose to use it unlawfully against Ramos, in violation of N.J.S.A. 2C:39-4d (Off. Defs.' Ex. N, Compl. 2010-3103), and the complaint for possessing the board under circumstances not appropriate for lawful use in violation of N.J.S.A. 2C:39-5d (Off. Defs.' Ex. N, Compl. 2010-3106).

Pursuant to *Kossler*, the analysis of favorable termination must begin with the elements of the crimes under New Jersey law.  *See Kossler*, 564 F.3d at 189; *see also Wiggins v. Robinson*, Civ. No. 07-2805 (KM/MCA), 2014 WL 3058466, at *6–7 (D.N.J. July 7, 2014).  The elements of the crimes for which Panarello acquitted must be compared with the crimes for

---

[25] The Officer Defendants' Statement of Material Facts attributes four criminal complaints to Officer Laielli, but the submitted record evidence shows that two of these four were in fact signed by Sergeant Riggione.  (*Compare* Off. Defs.' SMF ¶¶ 137, 140 *with* Off. Defs.' Ex. N., Compls. 2010-3103 and 2010-3106.)  In light of the submitted record evidence, the Statement of Material Facts will be disregarded to the extent it conflicts with the actual record evidence.

which Panarello was convicted.  This Court will only compare the acquitted charges with the

conviction for resisting, as the conviction for assault on the EMT is clearly different in time and

place from all of the other crimes for which Panarello was accused.

 A person is guilty of resisting arrest in New Jersey "if he purposely prevents or attempts

to prevent a law enforcement officer from effecting an arrest."  N.J.S.A. 2C:29-2a.[26]  This is the

relevant conviction against which the unconvicted crimes must be compared.

 Panarello was charged with and acquitted of two different types of aggravated assault—

under N.J.S.A. 2C:12-1b(5)(a) against the officers and under N.J.S.A. 2C:12-1b(2) against

Ramos.  The offense of aggravated assault as charged under N.J.S.A. 2C:12-1b(5)(a) is

committed when a person commits an act of simple assault against "[a]ny law enforcement

officer acting in the performance of his duties while in uniform or exhibiting evidence of his

authority or because of his status as a law enforcement officer."  The underlying simple assault

offense is committed when one "(1) [a]ttempts to cause or purposely, knowingly or recklessly

causes bodily injury to another; (2) [n]egligently causes bodily injury to another with a deadly

weapon; or (3) [a]ttempts by physical menace to put another in fear of imminent or serious

bodily injury."  N.J.S.A. 2C:12-1a.  The offense of aggravated assault as charged under N.J.S.A.

2C:12-1b(2) is committed when one "[a]ttempts to cause or purposely or knowingly causes

bodily injury to another with a deadly weapon."  Further, Panarello was charged with

obstruction, the elements of which have been detailed in Section IV.B.2.ii.b, *supra*.

 Panarello was also charged with two different weapons offenses related to possessing the

wooden board.  A person is guilty of possession of weapons for unlawful purposes under

---

[26] The remainder of the relevant portions of the statute apply to grading of the offense, which is
immaterial to this inquiry.

N.J.S.A. 2C:39-4d when he "has in his possession any weapon, except a firearm, with a purpose to use it unlawfully against the person or property of another."  A person is guilty of unlawful possession of weapons under N.J.S.A. 2C:39-5d when he "knowingly has in his possession any other weapon under circumstances not manifestly appropriate for such lawful uses as it may have."

The convicted offense does not share elements with any of the acquitted offenses, nor is the convicted offense a lesser included offense of any of the acquitted offenses.  However, the inquiry proceeds to look at the "underlying conduct that the charges sought to punish."  *See Kossler*, 564 F.3d at 189.  Here, the resisting arrest charge and charges for aggravated assault against Officers Laielli and Shaw were meant to punish Panarello's conduct during the course of effecting his arrest.  Even viewing the evidence in the light most favorable to the Plaintiffs, they cannot maintain their claim for malicious prosecution as it relates to charges for aggravated assault against Officers Laielli and Shaw, as Plaintiffs cannot prove that there was a favorable termination of the proceedings with respect to these charges.

Regarding the obstruction charge, this Court cannot accept the argument from the Officer Defendants that "Judge Golden essentially merged the obstruction charge with the resisting arrest charge" to conclude that the obstruction charge was aimed at the same culpable conduct as the resisting arrest charge.  (Off. Defs.' Mot. Br. at 23 n.7.)  However, it was the alleged act of obstruction that led Officers Laielli and Shaw to determine to arrest Panarello, thus setting in motion the course of events leading to his resisting arrest conviction.  Accordingly, this too was part of the underlying conduct the charges sought to punish, and so Plaintiffs cannot demonstrate

a favorable termination of the proceedings with respect to the obstruction charge.[27]  Thus, no

liability can exist for Officers Laielli and Shaw for malicious prosecution.

The remaining charges—aggravated assault against Ramos and the two weapons

offenses—relate solely to Panarello's conduct in relation to Ramos, and the criminal complaints

were authored by Sergeant Riggione.  This is distinct from the conviction of resisting arrest, even

though investigation of the crime is what led the officers to Plaintiffs' property.  Therefore,

viewing the evidence in the light most favorable to the Plaintiffs, the Court cannot find that the

proceedings did not terminate in Panarello's favor.  The Court must move on to assessing

probable cause for these three offenses.

At the time the criminal complaints were authored, the Officer Defendants had probable

cause to believe that Panarello had committed aggravated assault against Ramos and had

committed the two weapons offenses.  Taking the facts as admitted by Plaintiffs, the officers

heard from Ramos, the victim, and his wife that Panarello had attempted to strike Ramos with a

wooden board, but had failed to make contact.  (*See* Pls.' Resp. to Off. Defs.' SMF at 2–3.)  The

board qualified as a deadly weapon, under the statutory definition of a deadly weapon.  *See*

N.J.S.A. 2C:11-1c ("'Deadly weapon' means any . . . other weapon, device, instrument, material

or substance . . . which in the manner it is used . . . is known to be capable of producing death or

serious bodily injury . . . .")  Even viewing the evidence in the light most favorable to the

Plaintiffs, it is clear that a wooden board swung at someone in an attempt to strike them can be

considered a deadly weapon under the broad statutory definition.  This information provided

---

[27] Additionally, this Court has already determined that probable cause existed to arrest Panarello
for the act of obstruction.  *See* Section IV.B.2.ii.b, *supra*.  Thus, even if this could be separated
from the resisting arrest charge, probable cause existed, which defeats any claim for malicious
prosecution.

police with probable cause to believe that aggravated assault as charged under N.J.S.A. 2C:12-1b(2) had been committed because Panarello had "[a]ttempt[ed] to cause . . . bodily injury to another with a deadly weapon."  It is of no moment that there was no actual contact between the wooden board and Ramos; the act of swinging the board at Ramos is sufficient under the statute.

Turning to the weapons offenses, these too are supported by probable cause.  Based on the information available to Sergeant Riggione, Panarello "ha[d] in his possession any weapon, except a firearm, with a purpose to use it unlawfully against the person . . . of another."  N.J.S.A. 2C:39-4d.  Similarly, based on the information available to Sergeant Riggione, Panarello "knowingly ha[d] in his possession any other weapon under circumstances not manifestly appropriate for such lawful uses as it may have."  N.J.S.A. 2C:39-5d.  Having a board in one's possession to use to strike another is to use it unlawfully and to use it in circumstance not manifestly appropriate for its lawful use.  Thus, probable cause existed for all three offenses related to Ramos, and no malicious prosecution claim can lie.  Based on the foregoing, the Officer Defendants' Motion and the Municipal Defendants' Motion[28] will be granted in this respect, and any constitutional claim for malicious prosecution will be dismissed.

## ii.    Abuse of Process

"[A] section 1983 claim for malicious abuse of process lies where 'prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law.'" *Rose v. Bartle*, 871 F.2d 331, 350 n.17 (3d Cir. 1989) (quoting *Jennings v. Shuman*, 567 F.2d 1213, 1217 (3d Cir. 1977)).  The Officer Defendants argue that Plaintiffs have failed to put forth any evidence that the criminal complaints were used for any ulterior motive.  (*See* Off. Defs.'

---

[28] The ultimate relief sought by the Municipal Defendant's Motion is proper, although the reasoning in the Motion was not.

Mot. Br. at 23–24.)  Plaintiffs, rather than come forth with evidence to counter this argument

simply argue that "[g]enuine issues of material facts exist as to what role, if any, did the

[Vineland Police Department] play in determining in which court . . . the charges were going to

be tried."  (Pls.' Cross Mot. Br. at 26.)  The determination of what court—Municipal Court or

Superior Court—had jurisdiction over the criminal complaints cannot support a claim for abuse

of process as to any of the Officer Defendants or Municipal Defendants.  Accordingly, the

Officer Defendants' Motion and the Municipal Defendants' Motion will be granted, and any

constitutional claim for abuse of process will be dismissed.

### C.        Constitutional Claims Against the City of Vineland and Chief Codispoti

Plaintiffs have also alleged liability against both the City of Vineland and Chief

Codispotti in his capacity as Chief of Police of the Vineland Police Department.  To hold the

City liable under § 1983, Plaintiffs must demonstrate that their rights were violated by a policy

or custom of the City of Vineland.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S.

658, 691 (1978); *see also Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir. 2007) ("Thus,

there are two ways that a plaintiff can establish municipal liability under § 1983:  policy or

custom.").  "A municipality cannot be held liable for the unconstitutional acts of its employees

on a theory of *respondeat superior*."  *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir.

2014) (citing *Monell*, 436 U.S. at 691).

Additionally, municipal liability under § 1983 requires an underlying constitutional

violation.  *See Monell*, 436 U.S. at 690–91.  "[I]f there is no violation in the first place, there can

be no derivative municipal claim."  *Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 238

n.15 (3d Cir. 2013) (citing *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).  With this in mind,

the only potential constitutional violations that have survived summary judgment are allegations

of excessive force during Panarello's transport to the police station and for the use of OC spray against him while in the booking room, allegations of unlawful entry into his backyard to effect an arrest, and allegations of effecting a warrantless arrest in the backyard of Plaintiffs' home. Therefore, the policies or customs must relate to these alleged constitutional violations.

This Court understands Count I of the FAC to allege liability under three different theories: (1) a policy or custom of effecting unconstitutional arrests and searches; (2) a failure to train or supervise; and (3) an unconstitutional municipal ordinance regarding arrests. These will be analyzed in turn.

### 1.      Policy or Custom of Effecting Unconstitutional Arrests and Searches

Plaintiffs in opposing summary judgment argue that the City and the Chief have a "policy and custom of making unconstitutional warrantless arrests and unconstitutional warrantless entries onto private property and into private residences." (Pls.' Opp. to Muni. Defs.' Mot. at 16.) In support of their claim, Plaintiffs generally point to the "evidence of what occurred on July 7, 2010; Plaintiffs' expert's report; and . . . the Internal Affairs files that were produced in discovery." (*Id.*) Plaintiffs further argue that the internal affairs files demonstrate that "a significant number of Vineland police officers not only made unconstitutional arrests, searches and seizures, but were repeatedly exonerated by the police administration [internal affairs] process. Such unconstitutional action was therefore condoned by the Chief of the VPD." (*Id.* at 17.)

The City and the Chief move for summary judgment on the basis that none of the evidence adduced through discovery can support a finding of a policy or custom. Plaintiffs' expert, Mr. McComb, provided a supplemental report wherein he summarizes twelve internal affairs complaints that pertain to the Officer Defendants as well as six further complaints

42

pertaining specifically to Ramos, which span a time period of 1990 to 2013, and states that they "provide further support to [his] opinion that the defendant officers of the VPD are either untrained, or intentionally disregarding lawful arrest procedures, and lawful search and seizure procedures." (McComb Supp. Rep. (Muni. Defs.' Ex. T) at 1–2.)[29]  Plaintiffs have succeeded in doing more than merely reciting statistics, but additionally, "a Plaintiff must show why those prior incidents deserved discipline and how the misconduct in those situations was similar to the present one." *Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010) (quotations omitted).

Plaintiffs here have failed to tie the prior complaints to the current conduct, and further have failed to submit the actual complaints into the evidentiary record.  The only internal affairs complaint submitted by Plaintiffs is the one complaint against Ramos made by Panarello and Sherie Panarello in February 2010.  (*See* Pls.' Opp. to Muni. Defs.' Mot. Ex. H [Dkt. No. 180-9].)[30]  That one complaint was about neither unconstitutional arrests nor searches, and the police department *sustained* the complaint.  (*See id.*)  It is not clear to this Court how this complaint is relevant to the claim or how it could support the claim.  The Court cannot accept the summaries of the complaints provided by Plaintiffs' expert of what the complaints actually say, and the summaries do not provide any information regarding how the complaints were investigated and how the ultimate conclusion of no violation was reached.  Even viewing the evidence in the light

---

[29] The Municipal Defendants' argument that complaints post-dating the incident for which Panarello was arrested are irrelevant is incorrect.  *See Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (holding that complaints occurring after an incident regarding excessive force "may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force").

[30] Plaintiffs' counsel appears to have submitted the wrong exhibits initially to the opposition, and subsequently replaced the exhibits at Docket Number 180 and its attachments.

most favorable to Plaintiffs, the Court must conclude that Plaintiffs have not offered the type of evidence necessary to demonstrate a genuine issue of material fact regarding a custom or policy of permitting unconstitutional arrests or searches.  Accordingly, the Municipal Defendants' Motion will be granted with respect to this issue.

### 2.      Failure to Train or Supervise

When Plaintiffs allege that a policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Thomas*, 749 F.3d at 222.  Additionally, "the deficiency in training must have actually caused the constitutional violation."  *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)) (internal quotation marks and alterations omitted).  "'Deliberate indifference' is a stringent standard of fault, requiring proof that the municipal actor disregarded a known or obvious consequence of his action."  *Id.* at 223 (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 410 (1997)) (internal quotation marks and alterations omitted).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bryan Cty.*, 520 U.S. at 409).

Plaintiffs have come forth with evidence from their expert, Mr. McComb, in support of their claim.  However, Mr. McComb notes in his report that at the time of his report he did not have the opportunity to review multiple lesson plans or manuals from the Vineland Police Department regarding use of force, use of OC spray, and search and seizure, and so his opinion does not include any information that may have been obtained from those documents.  (*See* McComb Rep. (Muni. Defs.' Ex. G) at 6.)  Plaintiffs have pointed to nothing to indicate that the

training or supervision were actually deficient.  (*See*   References are made to the internal affairs complaints regarding a failure to supervise (*see* Pls.' Opp. to Muni. Defs.' Mot. at 22–23), but as explained in Section IV.C.1, *supra*, Plaintiffs have failed to submit the actual complaints into the evidentiary record.  Further, as explained in Section IV.C.1, *supra*, the alleged pattern of constitutional violations as demonstrated through internal affairs complaints is insufficiently supported by the evidence.  Therefore, the alleged pattern cannot possibly rise to the level of deliberate indifference needed for a failure to train or supervise claim.  With this absence of proof from Plaintiffs, the Municipal Defendants' Motion will be granted with respect to this claim.

### 3.     Ordinance Mandating Arrests

Finally, Plaintiffs argue that the City and the Chief should be held liable under § 1983 based on an ordinance that they allege condones and mandates unconstitutional arrests.  "There must be a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'"  *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004) (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214 (3d Cir. 2001)).  Plaintiffs in a § 1983 suit also "must prove that 'action *pursuant to* official municipal policy' caused their injury."  *Connick*, 563 U.S. at 60 (quoting *Monell*, 436 U.S. at 691) (emphasis added); *see also Bryan Cty.*, 520 U.S. at 404 ("The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged.").

Plaintiffs point to an ordinance of the City of Vineland that states in relevant part:

The several policemen, when on duty, shall preserve order, peace and quiet and promptly report to the Chief of Police all violations of the laws and ordinances. They shall have power to arrest without warrant all persons in the act of violating any law or ordinance or in aiding or abetting in any such violation and *shall arrest*

> *all persons found under suspicious circumstances* and shall take all such persons
> so arrested to the city jail.

Code of the City of Vineland art. I, ch. 123, § 123-4 (emphasis added).  Plaintiffs argue

that this ordinance is facially unconstitutional, on the grounds that a constitutionally valid

arrest requires probable cause, which is a higher standard than merely "suspicious

circumstances."  (Pls.' Opp. to Muni. Defs.' Mot. at 19–20 (citing *Beck v. Ohio*, 379 U.S.

89, 91 (1964)).)

 The Municipal Defendants counter that Plaintiffs cannot show that Panarello's arrest was

an action pursuant to this ordinance, and that the City does not train or inform its officers of this

policy, nor does it encourage officers to act in an unconstitutional manner.  (Muni. Defs.' Mot.

Br. at 35–36; Muni. Defs.' SMF ¶¶ 39–40.)  The Municipal Defendants point to the testimony of

Chief Codispoti in support of their position.  At deposition, Chief Codispoti testified regarding

the ordinance that "[t]his language is fifty years old.  It's never been used as a part of our

training.  I doubt that there's ten of the officers in the department that even know this exists, and

it's not something that we follow, train on, use, post, et cetera."  (Codispoti Dep. Tr. (Muni.

Defs.' Ex. N) at 69:25–70:4.)  He further testified, "I have myself, since I've been chief and

before that, we have brought that up to the city fathers, asked for language updates.  We're aware

of it, that this is language that is not part of anything to anything.  The previous chief brought

this up.  You're very much right.  This language is from days gone by."  (Codispoti Dep. Tr. at

70:12–18.)

 Plaintiffs fail to attempt to tie the ordinance here to his arrest, and they fail to rebut the

Municipal Defendants' evidence with anything other than conjecture and rhetoric to demonstrate

that the officers are in fact trained on this policy or instructed pursuant to this ordinance to effect

arrests under "suspicious circumstances" and without probable cause.  Additionally, this Court

has already determined, as explained in Section IV.B.2.ii.b, *supra*, that at the time of Panarello's

arrest, Officers Laielli and Shaw had probable cause to arrest him for obstruction.  Thus, even if

Plaintiffs could prove that the officers were trained on this ordinance, it would have no bearing

on Panarello's own arrest, because his arrest was made with probable cause.  The potential

constitutional violation involved in Panarello's arrest is that it was a warrantless arrest within the

curtilage.  *See* Section IV.B.2.ii.b, *supra*.  The ordinance here speaks not at all to that issue, and

so cannot be tied to the underlying constitutional violation.  This theory of liability cannot be

sustained, and the Municipal Defendants' Motion will be granted in this respect.

### D.    State Law Torts

#### 1.    Intentional Torts

Plaintiffs allege two counts of intentional tort in the FAC.  First, Plaintiffs allege liability

for the City, the Officer Defendants, and Ramos for assault and battery.  (*See* FAC Count VI.)

Second, Plaintiffs allege liability for the City and Officers Laielli, Shaw, and Armstrong for false

arrest.  (*See* FAC Count VII.)  For the reasons that follow, the only claim that survives summary

judgment is the claim against Ramos for assault and battery because Ramos has failed to

challenge that claim.  All other intentional tort claims will be dismissed.

#### i.    Liability for the City of Vineland for Intentional Torts

The City moves for summary judgment on the intentional torts on the grounds that

holding it liable would in effect be holding the City vicariously liable for the conduct of the

individual officers.  (*See* Muni. Defs.' Mot. Br. at 45–46, 48.)  Under the NJTCA, a "public

entity is not liable for the acts or omissions of a public employee constituting a crime, actual

fraud, actual malice, or willful misconduct."  N.J.S.A. 59:2-10.  "[T]here can be no vicarious

liability by a public entity for intentional torts committed by its employees; that is, with respect

to such intentional torts, the theory of respondeat superior does not apply."  *Hoag v. Brown*, 397

N.J. Super. 34, 54 (App. Div. 2007) (citations omitted); *see also Ewing v. Cumberland Cty.*, -- F.

Supp. 3d --, Civ. No. 09-5432 (JBS/AMD), 2015 WL 1384374, at *29 (D.N.J. Mar. 25, 2015).

Plaintiffs offer no meaningful response to this argument, only replying to "assert that there are

genuine issues of material facts sufficient to deny summary judgment."  (Pls.' Opp. to Muni.

Defs.' Mot. at 27–28.)

   The FAC is rife with allegations of actual malice and willful misconduct, all of which are

incorporated by reference into the counts that allege intentional torts.  (*See* FAC Count VI ¶ 1;

Count VII ¶ 1.)  As another court of this district has reasoned, "if Plaintiff's evidence merely

established that the officers acted negligently, then his claims [of intentional tort] would fail on

the merits, irrespective of whether the City is immune, but if Plaintiff established that the officers

acted willfully, then N.J.S.A. 59:2-10 would immunize the City from liability on these claims."

*Monaco v. City of Camden*, Civ. No. 04-2406 (JBS), 2008 WL 408423, at *15 (D.N.J. Feb. 13,

2008).  The Court agrees with this reasoning, and Plaintiffs have made no significant argument

as to why the NJTCA does not bar the claims against the City.  Accordingly, the Municipal

Defendants' Motion will be granted in this respect, and the claims for assault and battery and

false arrest against the City will be dismissed.

### ii.  Assault and Battery

   As noted by the court in Section IV.A, *supra*, Plaintiffs' failure to comply with the

NJTCA mandates dismissal of the claims against Officers Armstrong and Day for assault and

battery based on transport to the police station and use of the OC spray at the police station.

Therefore, the only possible assault and battery would be the one in effecting Panarello's arrest.

The Officer Defendants move for summary judgment on the state law claim of assault and

battery for the same reasons they have moved for summary judgment on the § 1983 claim.  (Off. Defs.' Mot. Br. at 16–17.)

In New Jersey, "[a] person is subject to liability for the common law tort of assault if:  (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and (b) the other is thereby put in such immediate apprehension."  *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 591 (2009) (quoting *Wigginton v. Servidio*, 324 N.J. Super. 114, 129 (App. Div. 1999)) (internal quotations omitted). "The tort of battery rests upon a nonconsensual touching."  *Id.* (citing *Perna v. Pirozzi*, 92 N.J. 446, 461 (1983)).  A police officer may use such force as is reasonably necessary to effect an arrest, but once the force becomes excessive, the officer may be liable for assault and battery. *Hill v. Algor*, 85 F. Supp. 2d 391, 411 (D.N.J. 2000); *see also State v. Williams*, 29 N.J. 27, 39–40 (1959).

Although the Court in *Heck* was speaking specifically about a § 1983 case, the Court stated explicitly that it was relying on "the hoary principle that *civil tort actions* are not appropriate vehicles for challenging the validity of outstanding criminal judgments."  *Heck*, 512 U.S. at 486 (emphasis added).  The New Jersey courts have also applied the *Heck* doctrine to bar a state law tort claim of assault and battery.  *See Bustamante*, 413 N.J. Super. at 295; *see also* Section IV.B.3.ii, *supra*.  Thus, for the same reasons why the § 1983 claim cannot be sustained, the common law tort claim for assault and battery cannot be sustained either.

Accordingly, the Court will grant the Officer Defendants' Motion with respect to this claim.  Ramos has not moved this Court for relief, and so the claim will remain as it pertains to him.

### iii.    False Arrest

Under federal and New Jersey law, an officer may effect a warrantless arrest for minor offenses. *See Dangerfield*, 171 N.J. at 460 (finding that N.J.S.A. 40A:14-152 permits officers to perform warrantless arrests for "disorderly and petty disorderly persons offenses that occurred in their presence"); *see also* Section IV.B.2.ii.b, *supra*.  The existence of probable cause at the time of arrest is an absolute defense to the common law tort claim of false arrest.  *Taurus v. Borough of Pine Hill*, 189 N.J. 497, 521 (2007) (citing *Wildoner v. Borough of Ramsey*, 162 N.J. 375, 389 (2000)).  This Court has already determined that Officers Laielli and Shaw had probable cause to arrest Panarello at the time of his arrest.  *See* Section IV.B.2.ii.b, *supra*.  This is an absolute defense to his claim of false arrest.  Further, Officer Armstrong was not involved in the act of arresting Panarello.  Accordingly, the Officer Defendants' Motion will be granted with respect to the false arrest claim.

## 2.    Negligent Personal Injury

Plaintiffs further allege liability for the City and the Officer Defendants for negligent personal injury.  (*See* FAC Count X.)  The basis for this negligence claim by the language of the FAC is that "[t]he *aforesaid unlawful battery* against the Plaintiff was negligent. . . . [and/or] grossly negligent."  (FAC Count X ¶¶ 2–3 (emphasis added).)  As a matter of law, liability for the tort of battery cannot sound in negligence, gross or otherwise.  *See Caldwell v. KFC Corp.*, 958 F. Supp. 962, 970 (D.N.J. 1997) ("Common-law battery is an *intentional* tort . . . .") (emphasis added); Dan B. Dobbs, et al., *Law of Torts*, § 33 n.4 (2d ed. 2015) ("By definition, there is no such thing as a negligent battery."); *Restatement (Second) of Torts*, § 16 (1965) (requiring an intentional act for the tort of battery).  The Municipal Defendants and the Officer Defendants argue that this count should be treated merely as a recasting of the battery claim, and

treated the same as the separately pled count for assault and battery.  (*See* Muni. Defs.' Mot. Br. at 53–54; Off. Defs.' Mot. Br. at 16.)  Again, Plaintiffs only oppose on the basis of disputed facts.  (*See* Pls.' Opp. to Muni. Defs.' Mot. at 29; Pls.' Cross Mot. Br. at 21.)  The Court agrees with the moving defendants that this is a repleading of the earlier battery claim, and thus the Court will similarly grant the Municipal Defendants' Motion and the Officer Defendants' Motion in this respect, and dismiss the claim for negligent personal injury against all defendants.

### 3.     Negligent Training and Supervision

Plaintiffs allege liability for the City and the Chief for negligent training and supervision—two separate torts in New Jersey.  (*See* FAC Count IX.)  In New Jersey, to sustain a claim of negligent training, "a plaintiff must show that (1) the defendant owed a duty of care to the plaintiff to properly train its employees, (2) defendant breached that duty of care, (3) defendant's breach was the proximate cause of plaintiff's injury, and (4) defendant's breach caused actual damages to plaintiff."  *Brijall v. Harrah's Atl. City*, 905 F. Supp. 2d 617, 621 (D.N.J. 2012) (citing *Stroby v. Egg Harbor Twp.*, 754 F. Supp. 2d 716, 721 (D.N.J. 2010)).  The claim of negligent supervision requires showing that (1) the employer must have known or had reason to know that the employee exhibited dangerous characteristics; (2) there must be a reasonable foreseeability of harm to others; and (3) the negligent supervision must be the proximate cause of the alleged injury."  *Cordial v. Atl. City*, Civ. No. 11-1457 (RMB/AMD), 2014 WL 1095584, at *11 (D.N.J. Mar. 19, 2014) (citations omitted).

Plaintiffs do not point to any additional evidence beyond what was argued in support of the failure to train or supervise claims under § 1983.  (*See* Pls.' Opp. to Muni. Defs.' Mot. at 28–29.)  For the same reasons this Court was unpersuaded of the existence of a constitutional violation, *see* Section IV.C.2, *supra*, this Court does not believe Plaintiffs have brought forth

sufficient evidence, even viewed in the light most favorable to Plaintiffs, to support a claim for

the common law torts of negligent training and negligent supervision.  Accordingly, the

Municipal Defendants' Motion will be granted in this respect.

### 4.      Claims of Sheri Panarello

Finally, plaintiffs include a "per quod" claim for loss of consortium by Sheri Panarello

against the City and Officers Laielli and Shaw based only on the negligent infliction of personal

injuries to Panarello during his arrest.  (*See* FAC Count XIII.)  "A loss of consortium, or per

quod, claim is intended to compensate a person for the loss of a spouse's 'society,

companionship and services due to the fault of another.'"  *Kibble v. Weeks Dredging & Const.*

*Co.*, 161 N.J. 178, 190 (1999) (quoting *Wolfe v. State Farm Ins. Co.*, 224 N.J. Super. 348, 350

(App. Div. 1988)).  The per quod claim is "derivative of the injured spouse's personal injury

cause of action" but has distinct damages from the injured party's damages.  *Id.* (citations

omitted).  The Municipal Defendants and Officer Defendants move to dismiss the per quod claim

by Sheri Panarello on the basis that no claim of Panarello should survive summary judgment.

(*See* Muni. Defs.' Mot. Br. at 57; Off. Defs.' Mot. Br. at 28.)  Plaintiffs oppose on the basis that

Panarello's claims do survive summary judgment.  (*See* Pls.' Opp. to Muni. Defs.' Mot. at 30;

Pls.' Cross Mot. Br. at 27–28.)

The Court has determined that certain of Panarello's § 1983 claims are viable, but none

that relate to any injuries he sustained during his arrest.  The FAC specifically limits Sheri

Panarello's per quod claim to the alleged negligent conduct she witnessed.  (*See* FAC Count XIII

¶ 2.)  Plaintiffs have chosen to plead the per quod claim narrowly, and the consequence of that

action is that Sheri Panarello's per quod claim cannot survive summary judgment, as there is no

claim of Panarello relating to his arrest from which her per quod claim can derive.  Accordingly, the Municipal Defendants' Motion and the Officer Defendants' Motion is granted in this respect.

Plaintiffs also allege a claim for negligent infliction of emotional distress by Sheri Panarello, also against the City and Officers Laielli and Shaw, similarly based on her observation of injuries inflicted on Panarello during his arrest.  (*See* FAC Count XV.)  In New Jersey, this type of bystander claim for negligent infliction of emotional distress—a so-called *Portee* claim— requires the plaintiff to prove "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress."  *Abouzaid v. Mansard Gardens Assocs., LLC*, 207 N.J. 67, 78 (2011) (quoting *Portee v. Jaffee*, 84 N.J. 88, 101 (1980)) (internal quotations omitted).  The parties generally treat this claim in conjunction with the per quod claim.  (*See* Muni. Defs.' Mot. Br. at 61; Off. Defs.' Mot. Br. at 28.)

To prove a *Portee* claim, Plaintiffs need to come forth with evidence that the emotional distress was "sufficiently palpable, severe, or enduring to justify the imposition of liability." *Decker v. Princeton Packet, Inc.*, 116 N.J. 418, 431 (1989).  Plaintiffs have provided absolutely no evidence in the record that Sheri Panarello suffered any emotional distress at all, much less severe emotional distress.[31]  The only reference comes in Plaintiffs' responsive statement of material facts, where Plaintiffs state that Sheri "suffered trauma and pain as a result of witnessing such a violent event and such violence towards [her] husband."  (Pls.' Resp. to Off. Defs.' SMF

---

[31] Plaintiffs submitted a portion of Sherie Panarello's deposition transcript into the record, which at the very end includes the partial question "Have you seen any medical doctor for any—" and the transcript continues no further.  (S. Panarello Dep. Tr. (Pls.' Cross Mot. Ex. K [Dkt. No. 170-4]) at 94:25.)  It is possible that this may have continued into the very evidence needed to support this claim, but without it being in the record, the Court does not know.

at 13.)  As support for this, Plaintiffs cite to the certification of *John* Panarello.  The only possible support in Panarello's affidavit is just that Sheri Panarello was present; the affidavit does not speak to any trauma or pain.  (*See* Panarello Aff. [Dkt. No. 166-4] ¶ 5.)  Without evidence, the claim cannot survive summary judgment and must be dismissed.  Thus, the Municipal Defendants' Motion and the Officer Defendants' Motion will be granted with respect to this claim as well.

### E.       John Doe Defendants and Defendant Timothy Delouise

The Court will take this opportunity to dismiss on its own initiative the unnamed John Doe defendants and Defendant Timothy Delouise pursuant to Federal Rule of Civil Procedure 21.  Rule 21 provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."  Plaintiffs may pursue an action against fictitious parties until plaintiff has had an opportunity to conduct discovery.  *Hindes v. FDIC*, 137 F.3d 148, 155 (3d Cir. 1998).  "[F]ictitious parties must eventually be dismissed if discovery yields no identities . . . ."  *Id.* (quoting *Scheetz v. Morning Call, Inc.*, 130 F.R.D. 34, 36 (E.D. Pa. 1990)) (internal quotation marks omitted).

Discovery in this case closed on June 15, 2015.  (Amend. Sched. Ord. (May 22, 2015) [Dkt. No. 153].)  At no point since have Plaintiffs attempted to identify the John Doe defendants to this Court.  Therefore, as other courts of this district have held, "[i]t is appropriate, before proceeding to trial, to eliminate these fictitious defendants from this action under [Rule] 21."  *Adams v. City of Camden*, 461 F. Supp. 2d, 263 (D.N.J. 2006).  The FAC also contains absolutely no allegations regarding the conduct of Officer Timothy Delouise, despite him being

named as a defendant in the case caption.[32]  Accordingly, the Court will dismiss John Doe(s) (A–Z) as well as Officer Timothy Delouise.

## V.    CONCLUSION

For the foregoing reasons, the Municipal Defendants' Motion and the Officer Defendants' Motion will be granted-in-part and denied-in-part, and the Plaintiffs' Cross Motion will be denied.

The Court believes it helpful to elucidate clearly what claims remain in the case following this partial grant of summary judgment.  The remaining claims are:

- Count II, § 1983 claim, and Count XII, NJCRA claim, against:

  - Officers Laielli and Shaw for warrantless entry into Plaintiffs' backyard only in violation of the Fourth Amendment

  - Officers Laielli and Shaw for warrantless arrest in Plaintiffs' backyard in violation of the Fourth Amendment

  - Officer Armstrong for excessive force in transporting Panarello to the police station in violation of the Fourth Amendment

  - Officer Day for excessive force in using OC spray on Panarello at the police station in violation of the Fourth Amendment

  - Officers Laielli, Shaw, and Armstrong and Sergeant Riggione for retaliatory complaints in violation of the First Amendment

- Count V, § 1985 and § 1986 claim against the Ramos Defendants

- Count VI, assault and battery claim against Ramos

- Count VI, common law conspiracy claim against the Ramos Defendants

All other claims, as explained above, will be dismissed.

---

[32] It also does not appear that Officer Delouise has ever made an appearance in this matter.

Consistent with this opinion, there are now no claims pending against the City or Chief Codispotti or on behalf of Sheri Panarello.  These parties will be dismissed from the action.  An appropriate order accompanies this opinion.


Date:  February   8th  , 2016


                                        s/ Robert B. Kugler
                                        ROBERT B. KUGLER, U.S.D.J.